# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

Filed: June 29, 2026

```
* * * * * * * * * * * * * *   *
DEBORAH LORING,                *
                               *
                               *
         Petitioner,           *        No. 21-1670V
                               *
v.                             *        Special Master Young
                               *
SECRETARY OF HEALTH            *
AND HUMAN SERVICES,            *
                               *
         Respondent.           *
* * * * * * * * * * * * * *   *
```

*Anna Goulet Zimmerman*, Law Office of Manning & Zimmerman, Manchester, NH, for Petitioner.
*Meghan Murphy*, United States Department of Justice, Washington, DC, for Respondent.

## RULING ON ENTITLEMENT[1]

On August 6, 2021, Deborah Loring ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018).[2] Pet., ECF No. 1. Petitioner alleged that she received a pneumococcal conjugate ("PCV-13") vaccine on January 15, 2019, and "suffered an 'off-Table' injury, and the vaccination in question was the cause-in-fact of her Guillain Barré Syndrome [("GBS")[3]]." *Id.* at 1. Petitioner's motion for a ruling on the record clarified that Petitioner's GBS "was caused by a [PCV]-13 vaccine." Pet'r's Mot. at 1, ECF No. 30. Respondent argued against compensation, asserting that Petitioner "do[es] not reliably demonstrate that the [PCV-13] vaccine more likely than not causes GBS." Resp't's Response at 12, ECF No. 33.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Ruling will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] GBS is a "rapidly progressive ascending motor neuron paralysis of unknown etiology, frequently seen after an enteric or respiratory infection." *Guillain-Barré Syndrome*, DORLAND'S MED. DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=110689 (hereinafter, "DORLAND'S").

After carefully analyzing and weighing all the evidence presented in this case in accordance with the applicable legal standards,[4] I find that Petitioner has provided preponderant evidence that the PCV-13 vaccine she received on January 15, 2019, caused her to suffer from GBS. Accordingly, Petitioner is entitled to compensation.

## I.    Procedural History

Petitioner filed her petition, an affidavit, and medical records on August 6, 2021. Pet.; Pet'r's Exs. 1–10, ECF No. 1. Petitioner filed additional medical records between September 10, 2021, and May 11, 2022. Pet'r's Ex. 11, ECF No. 7; Pet'r's Ex. 12, ECF No. 16; Pet'r's Ex. 13, ECF No. 18. Respondent filed his Rule 4(c) Report arguing against compensation on September 9, 2022. Resp't's Report, ECF No. 20.

On February 10, 2023, Petitioner filed an expert report and supporting medical literature from Lawrence Steinman, M.D. Pet'r's Ex. 14-(1–35), ECF No. 22. On June 8, 2023, Respondent filed expert reports and medical literature from Dara G. Jamieson, M.D., and Stephen M. Hedrick, Ph.D. Resp't's Ex. A, Tabs 1–18, Resp't's Ex. C, Tabs 1–23, ECF No. 24. On August 8, 2023, Petitioner requested to proceed with a ruling on the record on the issue of entitlement. ECF No. 25; *see also* ECF No. 28. Petitioner filed a supplemental expert report from Dr. Steinman on October 18, 2023, along with additional medical literature. Pet'r's Ex. 15-(1–2), ECF No. 27.

On January 13, 2024, Petitioner filed a motion for a ruling on the record. Pet'r's Mot. Petitioner field additional medical records on April 4, 2024. Pet'r's Exs. 16–17, ECF No. 32. Respondent filed a response to Petitioner's motion for a ruling on the record on April 15, 2024, and Petitioner filed a reply on May 29, 2024. Resp't's Response; Pet'r's Reply, ECF No. 34. On June 13, 2024, Petitioner filed a joint status report indicating the record was complete for the purposes of entitlement. ECF No. 35. Petitioner filed additional medical records on July 19, 2024. Pet'r's Ex. 18, ECF No. 36. This case was reassigned to me on March 17, 2026. ECF No. 41.

This matter is now ripe for consideration.

## II.    Medical History

On January 15, 2019, Petitioner received her PCV-13 vaccination at 65 years old. Pet'r's Ex. 8 at 1, 44. Her medical history prior to vaccination is significant for a brachial plexus injury, in utero stroke, cervical multifocal peripheral nerve sheath tumors with consideration for multifocal neurofibromatosis,[5] and focal epilepsy during pregnancy. Pet'r's Ex. 5 at 17; Pet'r's Ex. 6 at 13; Pet'r's Ex. 8 at 17. Thirteen days after vaccination, on January 28, 2019, Petitioner

---

[4] While I have reviewed all of the information filed in this case, only those filings and records that are most relevant to the Ruling will be discussed. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

[5] Neurofibromatosis is "either of the two autosomal dominant disorders characterized by developmental changes in the nervous system and other structures, with the formation of neurofibromas. *Neurofibromatosis*, DORLAND'S; Neurofibromas are "a usually benign tumor of the peripheral nerves caused by abnormal proliferation of Schwann cells. *Neurofibroma*, DORLAND'S.

presented to the emergency department ("ED") for bilateral leg pain for the preceding five days. Pet'r's Ex. 5 at 67. On examination, she had a white blood cell count within the upper limit of normal range and did not exhibit neurological symptoms. *Id.* at 68–69. Dr. Robert Rix diagnosed her with "venous insufficiency of both lower extremities," and she was given a prescription for acetaminophen and furosemide. *Id.*

Petitioner returned to the ED on February 6, 2019, for "generalized weakness since the middle of September." Pet'r's Ex. 5 at 14. She complained of numbness, tingling, and weakness in her lower extremities with increasing edema, and noted that her legs felt like "rubber bands" so she was unable to ambulate. *Id.* at 15, 17. She also reported upper extremity numbness with an inability to lift her right arm. *Id.* at 15. The admitting physician noted Petitioner's mention of her PCV-13 vaccination and the manifestation of her symptoms thereafter. *Id.* at 17. Physician notes also indicated that Petitioner required assistance to bear weight and had a foot drop on her right leg. *Id.* at 15. Petitioner was admitted and saw Dr. Monica Burke, a neurologist, the next day for "possible [GBS]." *Id.* at 26. On examination, Petitioner had a systolic blood pressure in the 170s, weakness in her right upper extremity, diminished touch sensation below her ankles and hands, and absent reflexes in her upper and lower extremities. *Id.* at 18. Due to Petitioner's ascending numbness and weakness, Dr. Burke opined that her symptoms were consistent with GBS and initiated intravenous immunoglobulin ("IVIG") therapy. *Id.* at 28. Dr. Burke also noted a temporal relationship with the PCV-13 vaccination. *Id.* Dr. Burke was unsure whether Petitioner's neurofibromatosis/cyst-like lesions were a contributing factor to her clinical presentation. *Id.* At hospital discharge on February 12, 2019, Petitioner's final diagnosis was listed as acute inflammatory demyelinating polyneuropathy ("AIDP") GBS. Pet'r's 8 at 146. Dr. Burke prescribed gabapentin for Petitioner's right shoulder neuropathy and bilateral paresthesias. *Id.*

Petitioner spent one month in in-patient rehabilitation, from February 12, 2019, to March 12, 2019. Pet'r's Ex. 8 at 152, 158, 169. Her initial examination revealed right cervical radiculitis and bilateral paresthesias. *Id.* at 152. Upon discharge, Petitioner could ambulate more than 150 feet, had no tenderness in her musculoskeletal examination, but still had cervical radiculitis, paresthesias, and bilateral knee pain. *Id.* at 173. The instructions on her final report included the notation from Dr. Christopher Mertz, "[o]n top of that she has [GBS] from the pneumococcal vaccine [three] weeks ago." Pet'r's Ex. 10 at 14. Petitioner continued her treatment course with outpatient physical therapy, occupational therapy, and home health services. Pet'r's Ex. 7 at 1.

Petitioner saw her primary care provider on March 21, 2019. Pet'r's Ex. 3 at 12. She presented in a wheelchair but used a walker for at-home mobility. *Id.* Petitioner reported a "pins and needle" sensation, numbness in both feet, and cramping in her arms and legs. *Id.* at 14, 15. On examination, she had significant weakness in her right shoulder and right ankle dorsiflexion. *Id.* at 15. Given Petitioner's bilateral weakness, history of previous cerebral infarct, and tobacco use, her primary care provider increased her gabapentin dose and referred her to neurology. *Id.* at 16.

On April 12, 2019, Petitioner saw neurologist Diana Tanase. Pet'r's Ex. 6 at 13. Dr. Tanase's clinic notes characterized Petitioner's past medical history as complicated, "including most recent AIDP/[GBS] that developed in February 2019 within [two] weeks of a [PCV-13] vaccine." *Id.* at 16. She ambulated with a walker but still experienced right lower leg weakness more than her left. *Id.* On examination, she had lower extremity weakness, decreased pinprick sensation at T4-5, and hyporeflexia. *Id.* Her reflexes were absent in both ankles, knees, and

3

forearms. *Id.* Dr. Tanase recommended that Petitioner continue physical therapy and gabapentin for nerve pain. *Id.* Petitioner returned for a follow-up on August 12, 2019, and reported continued right lower leg weakness and discolored feet, i.e., a "bluish" color bilaterally. *Id.* at 67. Dr. Tanase noted that Petitioner had improved, and referred her to vascular surgery to evaluate cyanosis of her feet. *Id.* at 69. Dr. Tanase further noted that Petitioner continued to demonstrate hyporeflexia during a follow-up on November 12, 2019. *Id.* at 119. Vascular testing for toe cyanosis was unremarkable, but Dr. Tanase noted that Petitioner suffered from numerous neurilemmomas or tumors of the nerve sheath, which may be suggestive of neurofibromatosis. *Id.*

On January 4, 2020, Petitioner underwent an electromyogram ("EMG") and nerve conduction study ("NCS"). Pet'r's Ex. 6 at 163. The attending doctor noted "no electrodiagnostic evidence to suggest focal entrapment, brachial or lumbar plexopathy, lumbar radiculopathy, or generalized large fiber peripheral neuropathy." *Id.* at 167. Dr. Tanase described the EMG and NCS as "essentially normal" during a follow-up on March 12, 2020. *Id.* at 210. Petitioner reported a sensory loss in her fingers and feet and increased back pain. *Id.* Her examination was unchanged from the prior visit. *Id.* Dr. Tanase advised Petitioner to continue Lyrica for nerve pain and try alpha lipoic acid. *Id.*

An October 28, 2020 follow-up with Dr. Tanase revealed that Petitioner was stable and walking with a cane, but still numb on the bottom of her feet and fingers. Pet'r's Ex. 6 at 258. Petitioner indicated that she had not had a fall since the March 2020 visit. *Id.* On examination, Dr. Tanase noted "maximum motor improvement" with residual sensory neuropathic deficits and pain. *Id.* at 259. Dr. Tanase recommended a home exercise program and continued Lyrica for pain relief. *Id.* at 260.

Petitioner saw her primary care provider on March 16, 2022, with complaints of persistent numbness of her feet and right hand and the need to walk with a cane. Pet'r's Ex. 12 at 14, 16. Her neurologic examination was "nonfocal" and her GBS was deemed "stable." *Id.* at 16. On April 8, 2022, Petitioner returned to Dr. Tanase with continued "pins and needles" and finger pain which was "triggered by overuse." Pet'r's Ex. 13 at 33. Petitioner had been prescribed an increased dosage of Lyrica. *Id.* She had not fallen in eight months and was ambulatory with the use of a cane but fatigued easily. *Id.* Petitioner had "normal range of motion and strength," and no longer had right knee buckling. *Id.* at 33–34. However, on neurologic examination, Dr. Tanase noted chronic left brachial palsy due to Petitioner's decreased shoulder abduction in her left arm. *Id.* Dr. Tanase reported that Petitioner had a "gradual improvement with [] minimal motor deficits, however ha[d] increased allodynia/hyperalgia of fingers and soles as the sensations recovered." *Id.* at 36.

No additional medical records were filed.

## III.    Petitioner's Affidavit

On August 6, 2021, Petitioner filed a self-authored affidavit. Pet'r's Ex. 2. She detailed how eight days after the January 15, 2019 PCV-13 vaccine, which was her first pneumococcal vaccine, she "started experiencing pain in [her] heels which then spread to the lower legs over the next week or so." *Id.* at ¶¶ 3, 5. After the pain "continued to worsen," Petitioner sought treatment at Concord Hospital ED and was told she had varicose veins. *Id.* at ¶ 6. After speaking to her primary care physician and returning to the ED the following week, she was admitted due to "pins

4

and needles in [her] hands and feet, as well as numbness and constant pain, which was extending up [her] arms and legs." *Id.* at ¶¶ 7–8. During this hospitalization, Petitioner was diagnosed with GBS and described how she "was so sick that [she] remember[s] nothing of the time [] at Concord Hospital." *Id.* at ¶ 9. Despite in-and-out-patient rehabilitation and continued neurological care, as of 2021, Petitioner reported that she "still ha[s] numbness in [her] feet, cramping and pain in [her] calves, and weakness." *Id.* at ¶ 13. She also reported needing a cane to walk. *Id.* Petitioner asserted that prior to receiving her PCV-13 vaccine, she "was not experiencing any similar symptoms." *Id.* at ¶ 14.

## IV. Experts

### A. Expert Qualifications

#### 1. Petitioner's Expert, Lawrence Steinman, M.D.

Dr. Steinman is a board-certified neurologist and currently serves as a Professor of Neurology at Stanford University. Pet'r's Ex. 14 at 1. He received his M.D. from Harvard University and completed his medical internship and residencies in pediatric and adult neurology at Stanford University Hospital. Pet'r's Ex. 14-3 at 1. Throughout his clinical career Dr. Steinman has "cared for hundreds of adults and children with various forms of inflammatory neuropathy," including GBS. Pet'r's Ex. 14 at 1. Dr. Steinman has also published 12 articles in the field of molecular mimicry, in addition to numerous other publications. *Id.* He has also received several awards for his work in the field of neuro-immunology. *Id.* at 2–4.

#### 2. Respondent's Expert, Dara Jamieson, M.D.

Dr. Jameison is a board-certified neurologist and currently serves as a Clinical Associate Professor of Neurology at Weill Cornell Medicine. Resp't's Ex. A at 1. She received her M.D. from the University of Pennsylvania School of Medicine, where she also completed her medical internship, neurology residency, and research fellowship. Resp't's Ex. B at 1. She has over 30 years of clinical neurology experience and has "authored many papers published in peer reviewed journals, and authored two books, as well as book chapters and review articles of multiple neurological topics." Resp't's Ex. A at 1–2.

#### 3. Respondent's Expert, Dr. Stephen Hedrick, Ph.D.

Dr. Hedrick has been a Distinguished Professor, Emeritus at the University of California, San Diego since his retirement in July of 2021. Resp't's Ex. C at 1. He received a Ph.D. in Molecular Biology and Biochemistry (studying immunology) at the University of California, Irvine in 1980, followed by a fellowship at the National Institutes of Health from 1980 to 1983. *Id.* Dr. Hedrick has done extensive research and published first-author studies focused on immunology, including the process of self-tolerance, T cell receptors, and "the ecology and epidemiology of infectious diseases." *Id.* He is also a Distinguished Fellow of the American Association of Immunologists. *Id.*

**B. Expert Reports**

**1. Dr. Steinman**

In his initial expert report, Dr. Steinman reviewed Petitioner's medical records and asserted, "[b]ased on the medical record and the opinions of the treating physicians the diagnosis here is [GBS]." Pet'r's Ex. 14 at 7. Dr. Steinman explained that according to the National Institute of Neurological Disorders and Stroke Fact Sheet, GBS develops when "the immune system starts to destroy the myelin sheath that surrounds the axons of many peripheral nerves, or even the axons themselves." *Id.* at 8. It is an uncommon syndrome that usually "occurs a few days or weeks after the patient has had symptoms of a respiratory or gastrointestinal viral infection." *Id.* He noted that occasionally, it is triggered by surgery and "[i]n rare instances vaccinations may increase the risk of GBS." *Id.*

Dr. Steinman opined that Petitioner's GBS was caused by her PCV-13 via molecular mimicry. Pet'r's Ex. 14 at 8. Referring to an article self-authored in 1993, he explained that generally during this process, "shared structures on a virus or bacteria or in a vaccine can trigger a cross-reactive response to self." *Id.* (citing Pet'r's Ex. 14-10).[6] Dr. Steinman identified some potential cross-reactive components of the PCV-13 vaccine, including several streptococcus pneumoniae serotypes (polysaccharides) and the non-toxic diphtheria CRM197 protein. *Id.* at 8. He explained that each polysaccharide is "directly conjugated by reductive amination to the protein carrier CRM197, to form the glycoconjugate." *Id.* Furthermore, "phosphoglycerol is present in serotypes 18C and in 23F in the [PCV-]13 vaccine." *Id.* at 14. Dr. Steinman cited to Chang et al.[7] arguing the article "demonstrates that a phosphoglycerol linkage is quite necessary for immunogenicity of these capsular polysaccharides." *Id.* (citing Pet'r's Ex. 14-13). He continued that the 18C serotype contains a glycerol-phosphate group and an O-acetyl group, and "[t]he loss of these groups may potentially reduce the ability of the 18C polysaccharide to induce the desired immune response." *Id.* at 12.

As evidence of homology sufficient for cross reactivity between these vaccine components and host components, Dr. Steinman cited to multiple sclerosis ("MS")[8] studies to explain that "phospholipids are components of the myelin sheath in humans, and [] they are targeted by antibodies in neuroinflammation." Pet'r's Ex. 14 at 9. He argued that "autoantibodies against lipids may contribute to the demyelination" and in MS cases, his joint research found "[t]he main target of the human immune response to the myelin lipids was the phosphoglycerol component, common to phosphatidyl-ethanolamine, phosphatidyl-choline, phosphatidylserine, as was shown in Ho et al."[9] *Id.* at 9 (citing Pet'r's Ex. 14-8).

---

[6] Lawrence Steinman, *Autoimmune Disease*, 269 SCI. AM. 107 (1993).

[7] Janoi Chang et al., *Relevance of O-Acetyl Phosphoglycerol Groups for the Antigenicity of Streptococcus Pneumoniae Serotype 18C Capsular Polysaccharide*, 30 VACCINE 7090 (2012).

[8] MS is "a disease in which there are foci of demyelination throughout the white matter of the central nervous system, sometimes extending into the gray matter." *Multiple Sclerosis*, DORLAND'S.

[9] Peggy P. Ho et al., *Identification of Naturally Occurring Fatty Acids on the Myelin Sheath That Resolve Neuroinflammation*, 4 SCI. TRANSLATIONAL MED. 137 (2012).

The Bryson et al.[10] article also "illuminate[d] the centrality of the phosphate in glycerophosphate in a human antibody response to 23F after the human received a pneumococcal vaccine intended to elicit antibodies to 23F[, but t]he study was done with Pneumovax 23." Pet'r's Ex. 14 at 16 (citing Pet'r's Ex. 14-16). Dr. Steinman asserted that the "data from the Bryson [et al.] article demonstrates UNEQUIVOCALLY that the immune response to the serotype 23F component of Pneumovax 23 targets the phosphoglycerol in serotype 23F." *Id.* at 18. He acknowledged that Pneumovax 23 is a different vaccine but asserted that PCV-13 contains the same sugars as Pneumovax 23. *Id.* He mused that "[if] only there were such pictures with a study on [PCV-]13, it would be a 'perfect fit,' but [asserted that] in searching for evidence that is 'sound and reliable,' this is the best the Petitioner can do at the present time." *Id.* Dr. Steinman then argued that "[PCV-]13 is also designed to generate an immune response to serotype 23F." *Id.* He concluded that "[s]ince the 23F and 18C components of [PCV-]13 also contain the phosphoglycerol moiety that is targeted by the antibodies generated by Pneumovax, it is very likely that the immune response to 23F and 18C components of [PCV-]13 vaccine also targets the phosphoglycerol moiety." *Id.*

Dr. Steinman further acknowledged that the research supporting his theory is largely in the context of MS patients but to connect his research to GBS, he referred to the Nakos et al.[11] article noting that "phospholipid antibodies were found in patients with GBS." Pet'r's Ex. 14 at 9 (Pet'r's Ex. 14-12). "Antiphospholipid antibodies of the IgM, IgA, and IgG families were detected in all GBS patients but in none of the controls. Phosphatidylinositol, cardiolipin, phosphatidylcholine, and phosphatidic acid were the main antigens." *Id.* Noting also the U.S. Patent on PCV-13, Dr. Steinman restated the importance of phosphoglycerol and its presence in serotypes 18C and 23F. *Id.* at 14.

The Nakos et al. article noted that GBS "is an acute inflammatory polyneuropathy related to autoimmunity. However, no conclusive etiological concept has yet been found." Pet'r's Ex. 14-12 at 1. The authors sought to measure antibody levels before, during, and after treatment to determine useful indicators of treatment efficacy. *Id.* Noting the "close association between GBS and preceding infection," the article stated that "[a]pproximately 15–50% of patients with GBS develop anti-gangliosidic antibodies that target glycolipids." *Id.* at 2. The authors stated that "[l]ipopolysaccharides of C. jejuni share structural similarity with epitopes in gangliosides," and suggest cross-reactivity could occur between antibodies against the bacteria and host myelin sheaths. *Id.* The study revealed "a wide range of anti-phospholipid antibodies in patients with idiopathic GBS," and the authors stressed the importance of an investigation into this relationship. *Id.* at 5.

Dr. Steinman next identified CRM197 as one part of a second molecular mimicry homology. Pet'r's Ex. 14 at 19. CRM197 is "used to conjugate the pneumococcal polysaccharides in the [PCV-]13 vaccine to an immunogenic protein carrier." *Id.* Dr. Steinman then identified

---

[10] Steve Bryson et al., *Structures of Preferred Human IgV Genes-Based Protective Antibodies Identify How Conserved Residues Contact Diverse Antigens and Assign Source of Specificity to CDR3 Loop Variation*, 196 J. IMMUNOLOGY 4723 (2016).

[11] G. Nakos et al., *Anti-Phospholipid Antibodies in Serum from Patients with Guillain-Barré Syndrome*, 31 INTENSIVE CARE MED. 1401 (2005).

contactin-1 as the potential target, based on the Devaux et al.[12] paper that found "[i]n eight patients with GBS or CIDP, we identified that IgG antibodies recognized the native extracellular domain of NF186, gliomedin, or contactin." *Id.* at 19 (citing Pet'r's Ex. 14-20). The National Library of Medicine defines contactin-1 as "glycosylphosphatidylinositol-anchored neuronal membrane protein that functions as a cell adhesion molecule. It may play a role in the formation of axon connections in the developing nervous system."[13]

The Devaux et al. study sought to "investigate[] the prevalence of antibodies against nodal adhesion molecules in patients with GBS or chronic inflammatory demyelinating polyneuropathy ("CIDP")." Pet'r's Ex. 14-20 at 1. The study "identified NF186, gliomedin, and contactin as the immune targets of autoantibodies." *Id.* at 6. The authors further suggested that "autoantibodies to nodal adhesion molecules are more prevalent in GBS forms and are not related to secondary immune reactions against demyelinated or damaged myelinated fibers." *Id.* at 8. The results indicated that "the prevalence of these autoantibodies in [MS] may vary considerably." *Id.* Additionally, the authors warned that "[t]he causes generating these autoantibodies in GBS remain [] unknown." *Id.* While "[t]he presence of autoantibodies did not correlate with any antecedent illnesses in particular," the authors noted "that infectious agents showing molecular mimicry with nodal proteins may trigger the development of autoantibodies against NF186/gliomedin/contactin/NrCAM and simultaneously the development of IgM against gangliosides." *Id.* They then warned that they "did not detect IgM deposition at nodes or paranodes, albeit many patients showed IgM antibodies against gliomedin, NF186, contactin, or NrCAM. The importance of IgM against nodal adhesion molecules in GBS pathology is therefore uncertain." *Id.*

Dr. Steinman "used the NIH BLAST search tool and performed BLAST searches to align contactin-1 with the components of the CRM197" in PCV-13. Pet'r's Ex. 14 at 19. The parameters that Dr. Steinman set for the search were based on his on research that demonstrated "a viral peptide with homology at just [five] amino acids with a self-peptide can induce clinical signs of [experimental autoimmune encephalomyelitis ("EAE")] in mice," even when nonconsecutive, "but there cannot be a gap in the alignment of the proteins on the BLAST search." *Id.* Dr. Steinman again relied on research done in the context of MS to show how "a molecular mimic between EBNA1[, Epstein-Barr virus ("EBV") transcription factor] and a [CNS] protein called GlialCAM, triggers" the disease. *Id.* at 20. The identified homology consisted of "a stretch of 12 amino acids where they are five" that are identical. *Id.* at 21. The results of the CRM197 and contactin-1 BLAST revealed "[t]he sequence WEQAKALSVE has five of ten identical amino acids, and thus would be a region that [references] indicate might be capable of inducing a neuroinflammatory disease." *Id.* at 26.

Following his BLAST search, Dr. Steinman cross referenced the relevant results to the Immune Epitope Database ("IEDB") and Alignment Resource, publicly available online. Pet'r's Ex. 14 at 26. He described the IEDB as a "freely available resource funded by NIAID. It catalogs experimental data on antibody and T cell epitopes studied in humans, non-human primates, and other animal species in the context of infectious disease, allergy, autoimmunity, and transplantation." *Id.* Dr. Steinman noted that the sequence he identified, WEQAKALSVE, "is an

---

[12] Jerome J. Devaux et al., *Nodal Proteins are Target Antigens in Guillain-Barré Syndrome*, 17 J. PERIPHERAL NERVOUS SYSTEM 62 (2012).

[13] *CNTN1 Contactin 1 [ Homo sapiens (human) ]*, NATIONAL LIBRARY OF MEDICINE: NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, https://www.ncbi.nlm.nih.gov/gene/1272.

epitope in diphtheria toxin, which has only one amino acid difference from CRM197." *Id.* at 27. He continued that "[h]umans have been shown to mount T cell responses to these regions of the diphtheria molecule." *Id.* at 29. Dr. Steinman summarized his process:

> These congruent findings between 1) Petitioner's various searches on public databases, 2) the three steps of filtration using peer reviewed journals as one criterion, 3) searches on different US government-financed search tools (BLAST, and IEDB), and now step 4) showing a correlation with detailed studies on the human immune response to diphtheria toxin, differing in only one amino acid from CRM, continue to make a compelling theory, that is sound and reliable, for how molecular mimics in [PCV-]13 can cause GBS.

*Id.* at 30.

Additionally, Dr. Steinman discovered "an alignment between the CRM197 component of the [PCV-]13 vaccine and Caspr2, an antigen targeted in GBS." Pet'r's Ex. 14 at 30. A second BLAST search comparing diphtheria toxin and Caspr2 revealed a region sharing seven of nine identical amino acids. *Id.* at 31. Dr. Steinman concluded that phosphoglycerol and a CRM197 region are two molecular mimics in the PCV-13 vaccine. *Id.*

In conclusion, Dr. Steinman summarized the reasoning in support of his assertion that Petitioner's "PCV 13 vaccine more likely than not, triggered [her GBS.]" Pet'r's Ex. 14 at 33. First, he noted that an eight-day symptom onset "is consistent with" GBS following swine flu. *Id.* Second, "[g]iven the role of antibody to phosphoglycerol groups in GBS the theory of molecular mimicry provided is sound and reliable[; further, t]he additional link . . . between contactin-1 targeted in GBS and the protein . . . CRM provides additional support." *Id.* Dr. Steinman concluded "[t]he vaccine has constituents that induce antibodies known to cross-react with myelin proteins and lipids and that are found in patients with GBS." *Id.* at 37.

## 2. Dr. Jamieson

Dr. Jamieson ultimately opined that Petitioner "met the criteria for the diagnosis of the sensorimotor variant of GBS starting around [nine] days after vaccination with [PCV-13]." Resp't's Ex. A at 13. She described the AIDP subtype of GBS as "present[ing] with progressive, symmetric, leg followed by arm, distal to proximal, weakness with absent or depressed deep tendon reflexes." *Id.* at 7. In the sensorimotor GBS variant, "sensory loss in a distal greater than proximal pattern may be seen" and "distal dysesthetic pain may be one of the presenting symptoms even prior to weakness." *Id.* Dr. Jamieson stated that according to the Brighton Collaboration GBS Working Group, diagnostic criteria include:

> bilateral, flaccid weakness of the limbs; decreased or absent deep tendon reflexes in weak limbs; a monophasic illness pattern with an interval between the onset and the nadir of weakness of between 12 hours and 28 days with a subsequent clinical plateau; electrophysiologic findings on EMG/NCV testing consistent with GBS; cytoalbuminologic dissociation (i.e., elevation of CSF protein level above laboratory normal value with a CSF total white cell count <50 cells/ul); and the absence of an identified alternative diagnosis for weakness.

9

*Id.* at 8 (citing Resp't's Ex. A, Tab 9).[14] She explained that in the acute stage, autonomic nervous system dysfunction is common and noted that more "severe disease may be associated with respiratory and bulbar dysfunction." *Id.* Dr. Jamieson noted that the North American occurrence rate is one to two cases per 100,000 persons and that risk increases with advanced age. *Id.* at 7.

Nine days post vaccination, Petitioner "developed pain in her lower extremities followed by gradually worsening weakness of all extremities, legs worse than arms." Resp't's Ex. A at 7. Dr. Jamieson noted Petitioner's variable sensory loss "appeared to be distal, and she was found to be areflexic." *Id.* A GBS diagnosis was rendered without diagnostics, including EMG testing or CSF analysis. *Id.* However based on symptomology, Dr. Jamieson did not dispute that Petitioner's gait impairments lasted longer than six months. *Id.*

Dr. Jamieson asserted that GBS "is thought to be related to an immune reaction to a preceding triggering event[,] often . . . occurring shortly after an apparent infection." Resp't's Ex. A at 8. However, "[n]o preceding trigger is identified in about a third of cases; but about two-thirds of patients report respiratory or gastrointestinal symptoms within [four] weeks preceding the onset of weakness, usually by 10 to 14 days after the infection." *Id.* She explained treatment options and noted that "most patients . . . make a full recovery over the course of weeks to months." *Id.*

In support of her contention that GBS is not vaccine induced, Dr. Jamieson cited "[a] nested case-controlled study" that "found no evidence of an increased risk of GBS within the 180 days after any vaccinations, as well as all vaccinations combined." Resp't's Ex. A at 9 (citing Resp't's Ex. A, Tab 2).[15] She also noted "[t]wo epidemiologic studies from Kaiser and the Centers for Disease Control and Prevention showed that pneumococcal vaccines do not pose an increased risk of GBS." *Id.* Dr. Jamieson summarized the first study, Baxter et al.,[16] which analyzed 415 GBS patients and did not find "an association between [flu] vaccine or any other vaccine and development of GBS withing [six] weeks following vaccination." Resp't's Ex. A, Tab 1 at 8. The article did note that the authors "had limited power to fully assess the risk of GBS following vaccination due to the rarity of the outcome." *Id.* The second cohort study, Tseng et al.,[17] also examined adults at least 65 years of age "for risk of adverse events requiring medical attention following vaccination with PCV 13 as compared with vaccination with PPSV23." Resp't's Ex. A, Tab 13 at 1. A review of 313,136 doses of PCV-13 and 232,591 doses of PPSV23 revealed four adverse events of GBS following the former group and eight following the latter. *Id.* at 4, 6. These "results indicate that there is no significantly elevated risk of [GBS]." *Id.* at 7.

Case reports relied on by Dr. Steinman were also criticized by Dr. Jamieson. *See* Resp't's Ex. A at 9. She asserted that of 54 cases of GBS reported post vaccination in the U.S., only one case "with an unknown time interval between vaccination with a pneumococcal polyvalent vaccine

---

[14] James J. Sejvar et al., *Guillain-Barré Syndrome and Fisher Syndrome: Case Definitions and Guidelines for Collection, Analysis, and Presentation of Immunization Safety Data*, 29 VACCINE 599 (2011).

[15] Yong Chen et al., *Vaccines and the Risk of Guillain-Barré Syndrome*, 35 EUR. J. EPIDEMIOLOGY 363 (2020).

[16] Roger Baxter et al., *Lack of Association of Guillain-Barré With Vaccinations*, 57 CLINICAL INFECTIOUS DISEASES 197 (2013).

[17] Hung Fu Tseng et al., *Pneumococcal Conjugate Vaccine Safety in Elderly Adults*, OPEN FORUM INFECTIOUS DISEASES (2018).

and the onset of GBS, was listed." *Id.* Dr. Jamieson cited the Haber et al.[18] article that was described by the authors as "the first post-marketing safety review of PCV 13 in adults." Resp't's Ex. A, Tab 5 at 4. The study reviewed Vaccine Adverse Events Reporting System ("VAERS") submissions based on an inoculation period that covered approximately 16 million vaccine doses. *Id.* There were 11 reports of verified GBS "with symptom onset within 42 days of PCV 13 vaccination." *Id.* Dr. Jamieson noted that of the 11, "[e]ight cases had sufficient information to meet the Brighton case definition for GBS." Resp't's Ex. A at 10. The authors concluded that their "data mining analysis noted no disproportionate reporting for GBS." *Id.* (citing Resp't's Ex. A, Tab 5). Another case study of post vaccination GBS examined by Dr. Jamieson also involved "a complex constellation of comorbid conditions, received concomitant medications, and were exposed to multiple infections [without] a clear causal relationship between these events and PCV13 was not established." *Id.*

In direct response to Dr. Steinman's assertions, Dr. Jamieson noted that they agree Petitioner likely suffered from GBS, but she criticized "the inadequate evaluation of [Petitioner's] acute symptoms and the superimposition of acute and chronic symptoms that are likely attributed to her presumed neurofibromatosis and her peripheral nerve injury at birth." Resp't's Ex. A at 11. She further agreed that Petitioner's "symptoms of GBS persisted longer than [six] months; although, her persistent sensory symptoms were likely multifactorial, including GBS." *Id.* at 13. Dr. Jamieson described Dr. Steinman's reference to case studies involving "antibodies against contactin-associated protein-like 2 (CASPR2) [a]s interesting but of unknown significance." *Id.* at 12. She quoted the Rosch et al.[19] statement that "studies to evaluate CASPR2 and other neuronal antibodies in GBS may ultimately reveal their clinical and biological relevance." *Id.* (citing Resp't's Ex. A, Tab 16). Dr. Jamieson lastly argued that Dr. Steinman's reliance on data from a 1976 to 1977 pandemic flu vaccination to provide an analogous timeline and causation for PCV-13 vaccine and GBS "do not reflect current vaccination data with the bacterial pneumonia vaccine." *Id.* at 12. She deferred to Respondent's immunology expert to further "address the immunological opinions related to the [PCV-]13 vaccine and GBS." *Id.* at 13.

### 3. Dr. Hedrick

After providing a brief overview of GBS consistent with Drs. Steinman and Jamieson, Dr. Hedrick turned to the immunological processes implicated by GBS. *See* Resp't's Ex. C. He explained that "[t]he autoimmunity underlying GBS most prominently includes pathogenic antibodies that bind to components of the myelin sheath or the underlying axons." *Id.* at 3. He next explained the "idea" of molecular mimicry. *Id.*

> [A]n individual is exposed to a macromolecule . . . that is different enough from the myriad human macromolecules such that it is recognized as foreign by the immune system . . . , in the case of a protein, this protein induces a specific immune response that includes antibodies, specific T cells or both, that not only reacts with the inciting protein, but cross-reacts with a human protein.

---

[18] Penina Haber et al., *Post-Licensure Surveillance of 13-Valent Pneumococcal Conjugate Vaccine (PCV13) in Adults Aged ≥ 19 Years Old in the United States, Vaccine Adverse Event Reporting System (VAERS), June 1, 2012–December 31, 2015*, 34 VACCINE 6330 (2016).

[19] Richard E. Rosch et al., *Guillain-Barré Syndrome Associated with CASPR2 Antibodies: Two Paediatric Cases*, 19 J. PERIPHERAL NERVOUS SYSTEM 246 (2014).

*Id.* This is an example of autoimmunity, wherein "the inciting protein is different enough such that the body is not *tolerant*," and sees a foreign entity, "but [it is] similar enough that the resulting antibodies or T cells react with a *self* molecule." *Id.* Dr. Hedrick added that in order for molecular mimicry to then result in disease, "this cross-reactive immune response must be pathogenic, that is, it causes tissue destruction." *Id.* He noted that the most well-studied examples are related to infections but acknowledged that "there are rare examples molecular mimicry arising from vaccinations as well." *Id.*

Dr. Hedrick distinguished pathogenic molecular mimicry from direct immunization via a self-component. Resp't's Ex. C at 3. For example, he explained that the mouse model referenced by Dr. Steinman that illustrated how encephalomyelitis was induced after subjects were injected with a combination of the adjuvanted myelin basic protein and active pertussis toxin, is an example of the latter, not the former. *Id.* at 4. He provided another example involving rabbits with spinal cord tissue infected with rabies. *Id.* This, he asserted, is "an example of breaking down the various mechanisms of immune tolerance through potent means of immunization," and it is not molecular mimicry. *Id.* Dr. Hedrick compared those two examples to how C. jejuni infection can "result in the production of antibodies specific for neuronal membrane gangliosides. Gangliosides are sialic acid-containing glycolipids enriched in the mammalian nervous system and similar gangliosides are present on C. jejuni." *Id.* Unlike the C. jejuni example, Dr. Hedrick argued that "none of these other associations has been shown to result from a cross-reactive antibody response between the infectious agent and human neuronal components." *Id.*

In fact, Dr. Hedrick asserted that the 1976 mass immunization against swine flu that resulted in an increased incidence rate of GBS post vaccination was not an organic model of molecular mimicry. Resp't's Ex. C at 4. He stated that the mechanism linking the vaccinations to antibody production is unknown, but he noted speculation that "the virus, as it buds from the infected chicken cells, may retain some sialic acid-containing gangliosides of chicken origin. This would not be mimicry, per se, as discussed above, rather it would be inadvertent immunization with a 'self' molecule." *Id.* Subsequent flu vaccines have not resulted in similarly increased numbers of GBS. *Id.* The Wang et al.[20] study, cited by Dr. Hedrick, found no increased GBS rate following influenza, human papilloma virus, poliovirus, and measles-mumps-rubella vaccinations "covering 2.1 billion participants" up to six weeks post inoculation. *Id.* (citing Resp't's Ex. C, Tab 22). Indeed, Dr. Hedrick emphasized that VAERS and Vaccine Safety Datalink ("VSD") are programs that compile data from hundreds of millions of vaccinations; as such "cases of vaccine-caused autoimmunity, regardless of mechanism, do not escape the extant mechanisms of surveillance." *Id.* at 5.

Specific to PCV-13, Dr. Hedrick highlighted the "safety and immunogenicity studies [that] were carried out." Resp't's Ex. C at 5. One study "found 11 GBS reports with symptoms reported within 42 days of PCV13 vaccination, and this corresponds to 0.7 cases per million doses of vaccine distributed among adults aged >19 years." *Id.* at 6 (citing Resp't's Ex. A, Tab 5). The authors wrote "data mining analysis noted no disproportionate reporting for GBS." *Id.* (quoting Resp't's Ex. A, Tab 5 at 1).

---

[20] Fengge Wang et al., *Population Based Incidence of Guillain-Barré Syndrome During Mass Immunization With Viral Vaccines: A Pooled Analysis*, 13 FRONTIERS IMMUNOLOGY 782198 (2022).

In summary, Dr. Hedrick reiterated his expertise in immunology and the role of T cell receptors. Resp't's Ex. C at 6. He explained that "T cells thought to participate in autoimmunity, always recognize a relatively short polypeptide bound to a major histocompatibility complex (MHC) molecule." *Id.* Dr. Hedrick stated that both components (the peptide chain and the MHC) are necessary. *Id.* He described Dr. Steinman's detailed description of how to determine relevant homology for molecular mimics as "impressive," and characterized it as within the realm of possibility. *Id.* However, he cautioned that "finding a stretch of amino acids that look similar between two proteins, does not in itself constitute a reason to believe that the immune response to one protein, will react with the other." *Id.* Ultimately, "the experience of 100's of millions of vaccinations that have occurred since 2012," and "major conclusion[s] from studies on the safety of pneumococcal conjugate vaccines" are the basis for Dr. Hedrick's "strong[] doubt that [Petitioner's] GBS resulted from a PCV 13 vaccine." *Id.* at 7.

## V.     Applicable Legal Standards

To receive compensation under the Vaccine Act, a petitioner must demonstrate either that: (1) the petitioner suffered a "Table injury" by receiving a covered vaccine and subsequently developing a listed injury within the time frame prescribed by the Vaccine Injury Table set forth at 42 U.S.C. § 300aa-14, as modified by 42 C.F.R. § 100.3; or (2) that the petitioner suffered an "off-Table injury," one not listed on the Table, as a result of him receiving a covered vaccine. *See* § 300aa-11(c)(1)(C); *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1319–20 (Fed. Cir. 2006). In this case, GBS is not a Table injury associated with the PCV-13 vaccine, and thus Petitioner must prove by preponderant evidence that her injury was caused-in-fact by a Table vaccine.

### A.    Factual Issues

A petitioner must prove, by a preponderance of the evidence, the factual circumstances surrounding her claim. § 13(a)(1)(A). To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records, "in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1382 (Fed. Cir. 2021) (rejection the presumption that "medical records are accurate and complete as to all the patient's physical conditions"); *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 538 (2001) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance").

### B.    Causation-In-Fact

To establish causation-in-fact, a petitioner must demonstrate by a preponderance of the evidence that the vaccine was the cause of the injury. § 300aa-13(a)(1)(A). A petitioner is required to prove that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321–22 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999).

In the seminal case of *Althen v. Sec'y of Health & Hum. Servs.*, the Federal Circuit set forth a three-pronged test used to determine whether a petitioner has established a causal link between a vaccine and the claimed injury. *See* 418 F.3d 1274, 1278–79 (Fed. Cir. 2005). The *Althen* test requires petitioners to set forth: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* at 1278. To establish entitlement to compensation under the Program, a petitioner is required to establish each of the three prongs of *Althen* by a preponderance of the evidence. *Id.* "[C]lose calls regarding causation are resolved in favor of injured claimants." *Id.* at 1280. Further, evidence used to satisfy one prong of the test may overlap to satisfy another prong. *Capizzano*, 440 F.3d at 1326.

Under the first prong of *Althen*, a petitioner must offer a scientific or medical theory that answers in the affirmative the question: "can the vaccine[] at issue cause the type of injury alleged?" *See Pafford v. Sec'y of Health & Hum. Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. den'd*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such theory must only be "legally probable, not medically or scientifically certain." *Id.* at 548–49. Petitioners are not required to identify "specific biological mechanisms" to establish causation, nor are they required to present "epidemiologic studies, rechallenge[] the presence of pathological markers or genetic disposition, or general acceptance in the scientific or medical communities." *Capizzano*, 440 F.3d at 1325 (quoting *Althen*, 418 F.3d at 1280). Scientific and "objective confirmation" of the medical theory with additional medical documentation is unnecessary. *Althen*, 418 F.3d at 1278 – 81; *see also Moberly*, 592 F.3d at 1322. However, as the Federal Circuit has made clear, "simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof." *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) (citing *Moberly*, 592 F.3d at 1322). Indeed, the Federal Circuit has "consistently rejected theories that the vaccine only 'likely caused' the injury and reiterated that a 'plausible' or 'possible' causal theory does not satisfy the standard." *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1360 (Fed. Cir. 2019) (citing *Moberly*, 592 F.3d at 1322; *LaLonde*, 746 F.3d at 1339). Rather, "[a] petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case." *Moberly*, 592 F.3d at 1322. In general, "the statutory standard of preponderance of the evidence requires a petitioner to demonstrate that the vaccine more likely than not caused the condition alleged." *LaLonde*, 746 F.3d at 1339.

Furthermore, establishing a sound and reliable medical theory connecting the vaccine to the injury often requires a petitioner to present expert testimony in support of her claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). The Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) requires that courts determine the reliability of an expert opinion before it may be considered as evidence. However, in the Vaccine Program, the *Daubert* factors are used in the weighing of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("[U]niquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to the persuasiveness of expert testimony already admitted."); *see also Cedillo v. Sec'y of health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999)). Under *Daubert*, the

14

> Factors for analyzing the reliability of testimony are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

The *Daubert* factors are "meant to be helpful, not definitive." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). The factors do not "constitute a 'definitive checklist or test'" and may be applied differently depending on the facts of a particular case. *Id.* at 150 (quoting *Daubert*, 509 U.S. at 593).

"In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establish a standard of evidentiary reliability." *Daubert*, 509 U.S. at 590 (citation omitted). Thus, for Vaccine Act claims, a "special master is entitled to require some indicia of reliability to support the assertion of the expert witness." *Moberly*, 592 F.3d at 1324. Nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Synder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 743 (2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also D'Tiole v. Sec'y of Health & Hum. Servs.*, No. 15-085V, 2016 WL 7664475, at *24 (Fed. Cl. Spec. Mstr. Nov. 28, 2016) (stating that the Vaccine Act "require[s] a chain of reliable propositions supporting [a] petitioner's theory[]").

Under the second prong of *Althen*, a petitioner must prove that the vaccine actually did cause the alleged injury in a particular case. *See Pafford*, 2004 WL 1717359, at *4; *Althen*, 418 F.3d at 1279. The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). A petitioner does not meet this obligation by showing only a temporal association between the vaccination and the injury; instead, the petitioner "must explain *how* and *why* the injury occurred." *Pafford*, 2004 WL 1717359, at *4 (emphasis in original). The special master in *Pafford* noted petitioners "must prove [] both that her vaccinations were a substantial factor in causing the illness . . . and that the harm would not have occurred in the absence of the vaccination." 2004 WL 1717359, at *4 (citing *Shyface*, 165 F.3d at 1352). A reputable medical or scientific explanation must support this logical sequence of cause and effect. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (citation omitted). Nevertheless, "[r]equiring epidemiologic studies . . . or general acceptance in the scientific or medical communities . . . impermissibily raises a claimant's burden under the Vaccine Act and hinders the system created by Congress . . . ." *Capizzano*, 440 F.3d at 1325–26. "[C]lose calls regarding causation are resolved in favor of injured claimants." *Althen* 418 F.3d at 1280.

In Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano*, 440 F.3d at 1326 (citing *Althen*, 418 F.3d at 1280). Indeed, when reviewing the record, a special master must consider the opinions of treating physicians. *Capizzano*, 440 F.3d at 1326. This is because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination

15

was the reason for the injury.'" *Id.* In addition, "[m]edical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, there is no "presumption that medical records are accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (finding that a special master must consider the context of a medical encounter before concluding that it constitutes evidence regarding the absence of a condition). While a special master must consider these opinions and records, they are not "binding on the special master or court." § 300aa-13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record." *Id.*

To satisfy the third *Althen* prong, a petitioner must establish a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1281. This "requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to finger causation-in-fact." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). Typically, "a petitioner's failure to satisfy the proximate temporal relationship prong is due to the fact that onset was too late after the administration of a vaccine for the vaccine to be the cause." *Id.* However, "cases in which onset is too soon" also fail this prong; "in either case, the temporal relationship is not such that it is medically acceptable to conclude that the vaccination and the injury are causally linked." *Id.*; *see also Locane v. Sec'y of Health & Hum. Servs.*, 685 F.3d 1375, 1381 (Fed. Cir. 2012) ("[If] the illness was present before the vaccine was administered, logically, the vaccine could not have caused the illness.").

Although a temporal association alone is insufficient to establish causation, under the third prong of *Althen*, a petitioner must show that the timing of the injury fits with the causal theory. *See Althen*, 418 F.3d at 1278. The special master cannot infer causation from temporal proximity alone. *See Thibaudeau v. Sec'y of health & Hum. Servs.*, 24 Cl. Ct. 400, 403–04 (1991); *see also Grant*, 956 F.2d at 1148 ("[T]he inoculation is not the cause of every event that occurs within the ten[-]day period . . . [w]ithout more, this proximate temporal relationship will not support a finding of causation." (quoting *Hasler v. United States*, 718 F.2d 202, 205 (6th Cir. 1983))).

A petitioner who satisfies all three prongs of the *Althen* test has established a prima facie showing of causation. *Hammitt v. Sec'y of Health & Hum. Servs.*, 98 Fed. Cl. 719, 726 (2011). A petitioner who demonstrates by a preponderance of the evidence that she suffered an injury caused by vaccination is entitled to compensation unless the respondent can demonstrate by a preponderance of the evidence that the injury was caused by factors unrelated to the vaccination. *See Althen*, 418 F.3d at 1278; *Knudsen*, 35 F.3d at 547. In such a case, the government must not merely prove the existence of an alternative cause, but that such an alternative actually caused the injury. *Kundsen*, 35 F.3d at 549. Consequently, when and if the petitioner establishes a prima facie case, the burden the shifts to the government to prove that an alternative cause, unrelated to the administration of the vaccine, was the "sole substantial factor" in causing the alleged injury. *See de Bazan*, 539 F.3d at 1354; *see also Hammitt*, 98 Fed. Cl. at 726 (explaining that respondent's burden is to show that the "factor unrelated" was the "sole substantial factor" in causing the injury). Additionally, a factor unrelated "may not include 'any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness or condition.'" § 300aa-13(a)(2); *see*

16

*also Doe v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349 (Fed. Cir. 2010) (stating that an idiopathic diagnosis cannot be a "factor unrelated," as it is idiopathic).

## VI.    Analysis

### A.  Prior Claims

In the past few years, there have been several Program cases that have alleged a GBS injury following PCV-13 vaccination with split results from the special masters. In cases where there is disagreement among special masters regarding asserted causation theories, the presiding special masters will often distinguish the most recent decision from previous decisions. These varying perspectives are not necessarily problematic as "Congress desired the special masters to have very wide discretion with respect to the evidence they would consider and the weight to be assigned that evidence." *Whitecotton v. Sec'y of Health & Hum. Servs.*, 81 F.3d 1099, 1108 (Fed. Cir. 1996). Furthermore, this is done notwithstanding the Circuit's reaffirmance in *Gamboa-Vila* that "it was not arbitrary and capricious for a special master to make no attempt to distinguish the instant case from the other cases reaching opposite conclusions." *Gamboa-Avila v. Sec'y of Health & Hum. Servs.*, 166 F.4th 1318, 1323 (Fed. Cir. 2026) (citing *Boatmon*, 941 F.3d at 1358). It is also worth noting that many cases alleging the same vaccine/injury cause-and-effect were done with experts that may overlap but are not the same on both sides; sharing theories that are similar but not identical; and using literature that has been at times, novel, outdated, updated, or even abandoned.

Several special masters have found in favor of petitioners relying on Dr. Steinman's phosphoglycerol theory or some variation thereof.

### 1.  *Davison v. Sec'y of Health & Hum. Servs.*

In the *Davison* case, the petitioner relied on Dr. Steinman who proposed two molecular mimicry theories based on a phosphoglycerol theory and a CRM197 mimic, similar to the current case. *Davison v. Sec'y of Health & Hum. Servs.*, No. 19-1404V, 2025 WL 2692664, at *7 (Fed. Cl. Spec. Mstr. Aug. 19, 2025). The special master found in the petitioner's favor, noting that scientific certainty is not the evidentiary standard and "[w]ith regard to the application of molecular mimicry, prior cases have expressed that the line must be drawn somewhere between speculation and certainty." *Id.* at *12 (citing *Brayboy v. Sec'y of Health & Human Servs.,* No. 15-183V, 2021 WL 4453146, at *19 (Fed. Cl. Spec. Mstr. Aug. 30, 2021)). The special master further noted that Respondent's immunology expert, Dr. Zhang, did "not specifically discuss any of Dr. Steinman's more specific observations regarding the potential pathogenicity of phospholipid antibodies in GBS or any of the literature he relied upon." *Id.* at *10. The special master found that Dr. Steinman presented supporting evidence for his assertions:

> (1) the [PCV-]13 vaccine contains phosphoglycerol groups that are necessary to the vaccine's immunogenicity (citing Chang et al., supra, at Ex. 69; [PCV-]13 Patent, supra, at Ex. 71; Bryson et al., supra, at Ex. 72)); (2) the phosphate portion of the phospholipid molecule has immune reactivity in myelin tissue, albeit demonstrated in the context of a different demyelinating condition (multiple sclerosis) (*Id.* at 6 (citing Ho et al., supra, at Ex. 64)); (3) GBS patients develop antiphospholipid antibodies (*Id.* at 7 (citing Nakos et al., supra, at Ex. 68)), and (4) these antibodies are cross-reactive with phospholipids present in myelin tissue (*Id.* at 6 (citing Ho et al., supra, at Ex. 64)).

17

*Id.* at \*12. In response, Dr. Zhang's rebuttal was focused on the "fact that the wild *S. pneumoniae* infection has not been shown to cause GBS" and the lack of epidemiological studies. *Id.* at \*15. In his decision, the special master noted that "evidence of parallels to nature infection [] is never sufficient to either accept or reject a causal relationship." *Id.* at \*14 (citing *Gaskin v. Sec'y of Health & Human Servs.,* No. 21-835V, 2025 WL 786306 at \*12 (Fed. Cl. Spec. Mstr. Feb. 11, 2025)). He further noted epidemiology is not necessary for a petitioner to be successful. *Id.* at \*14 (citing *Capizzano*, 440 F.3d at 1325).

### 2.  *Fee v. Sec'y of Health & Hum. Servs.*

In the *Fee* case, the petitioner's expert, Dr. DeAngelo, also presented the theory "that molecular mimicry caused "a homologous interplay between the phosphoglycerol/phosphorylcholine within the [PCV-]13 vaccine and the phospholipid components in the human myelin sheath." *Fee v. Sec'y of Health & Hum. Servs.*, No. 19-1979V, 2026 WL 700326, at \*13 (Fed. Cl. Spec. Mstr. Feb. 13, 2026). Respondent's expert's, Dr. He's, rebuttal primarily warned against the overreliance on molecular mimicry in Program cases, a position he has taken in prior cases with a similar theory of causation. *Id.* at \*14; *see Parker v. Sec'y of Health & Hum. Servs.*, No. 20-411V, 2023 WL 9261248, at \*10 (Fed. Cl. Spec. Mstr. Dec. 20, 2023). He criticized Dr. DeAngelo's use of MS studies and the lack of supporting statistics. *Fee*, 2026 WL 700326, at \*14. Dr. He argued that it was "unclear whether GBS patients have similar types of autoantibodies targeting a phosphate group," and there was "no evidence that these autoantibodies are the initiators of MS, let alone GBS." *Id.* Dr. He also referred to the IOM, stating, "naturally occurring and postinfectious cross-reactive antibodies and T cells are relatively common and most frequently not pathogenic, and can also be secondary to a nonspecific tissue injury." *Id.* In finding for the petitioner, I noted that Dr. He "denounced molecular mimicry as a theory outright, contending that if it were true, all vaccines could cross-react to induce all kinds of autoimmune conditions." *Id.* at \*21. Dr. He did not refute the substance of Dr. DeAngelo's theory, but instead argued that without epidemiologic evidence, a traditional criterion sanctioned by the IOM to prove molecular mimicry, the theory was insufficient. *See id.* at \*9. I also noted that given the rare nature of many of the conditions seen in the Program and lack of testing practicality, epidemiological studies are not required. *See id.* at \*21.

Other special masters have found this theory less persuasive.

### 3.  *Gamboa-Avila v. Sec'y of Health & Hum. Servs.*

The Federal Circuit weighed in on a later PCV-13/GBS opinion wherein the chief special master denied entitlement. *Gamboa-Avila*, 166 F.4th 1318. While the decision was based in part on "the absence of support in the medical literature for Dr. Steinman's theories," the Circuit reiterated that "[a] special master may weigh the fact that a "proposed mechanism had never been tested in any peer-reviewed study" and may properly consider the weakness of medical literature support when evaluating the overall reliability of scientific evidence." *Id.* at 1322 (citing *Moberly*, 592 F.3d at 1324); *see Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1350–51(Fed. Cir. 2010). The chief special master identified very specific deficiencies in the asserted theory that caused for speculation below a more likely than not threshold. *Id.* at 1322–23. The Circuit found that the chief "special master did not apply a standard inconsistent with [their decision in] *Althen*," and his decision was not arbitrary and capricious. *Id.* There was some concern in the affirmance however, regarding the "the inconsistent factual findings among the special

masters on central issues presented in this case." *Id.* The petitioner argued on appeal that the "findings in this case [were] inconsistent with those reached by other special masters on identical evidence in other cases." *Id.* The Circuit also noted that the inconsistency in assessments by different special masters was noted in the entitlement denial. *Id.* at 1322. The identity of the special master ultimately determined the outcome in this case. *Id.* Special masters were encouraged to recommend a Claims Court "related-case rule or other mechanisms to avoid inconsistent rulings." *Id.* at 1324.

### 4. *Romine v. Sec'y of Health & Hum. Servs.*

Since the Circuit's finding in *Gamboa-Avila*, the *Romine* decision was published and included additional analysis to address some of the concerns articulated on appeal. *Romine v. Sec'y of Health & Hum. Servs.*, No. 19-468V, 2026 WL 937898, at *7 (Fed. Cl. Spec. Mstr. Mar. 13, 2026). The special master found that "four large-scale epidemiological studies have looked for an increased risk of GBS after vaccines against S[.] pneumoniae[ and] did not find an increased risk. *Id.* at *11. The special master further held that the reliability standard for potentially relevant homologs identified through BLAST searches was too generous based on the evidence. *Id.* at *13. Therefore, "any ensuing steps that follow from the BLAST searches are also problematic." *Id.* at *16. Because of the numerous other concerns with the fundamental methodology behind Dr. Steinman's reasoning, the decision did not reach the final step necessary for molecular mimicry. *Id.* The question of whether cross reactivity between identified components in PCV-13 and in human peripheral myelin "can contribute to the pathogenesis of GBS is not required [and] can be reserved for another day." *Id.*

### 5. *Hunt v. Sec'y of Health & Hum. Servs.*

I revisited Dr. Steinman's PCV-13/GBS causation theory recently in *Hunt* and noted the robust arguments and support provided by both the petitioner's and the respondent's experts in that record. *Hunt v. Sec'y of Health & Hum. Servs.*, No. 21-1379V, 2026 WL 1601989 (Fed. Cl. Spec. Mstr. May 8, 2026). I discussed the disagreements between special masters in accepting and rejecting Dr. Steinman's phosphoglycerol theory and his BLAST search methodology up to that point, the Federal Circuit's holding that special masters are not bound by the decisions of their colleagues, and the preponderant evidence standard in a Program that was created "to allow the finding of causation in a field bereft of complete and direct proof of how vaccines affect the human body." *Althen*, 418 F.3d at 1280; *see generally Hunt*, 2026 WL 1601989. That case is of particular note, because I found that the petitioner did not meet his burden. *Hunt*, 2026 WL 1601989, at *36. While acknowledging my prior decisions, I wrote that unlike *Fee*, "different experts on behalf of Respondent did not concede any aspect of [p]etitioner's theory and challenged all of Dr. Steinman's assertions." *Id.* Indeed, with respect to the literature interpretation, the significance of the immunogenicity of Dr. Steinman's identified epitopes, and the similarities between the asserted mimics in Dr. Steinman's MS research and the proposed mimics pursuant to his PCV-13/GBS theory, the Respondent's expert persuasively countered the soundness and reliability of Dr. Steinman's theory at each step. *Id.* The petitioner in *Hunt* did not establish a prima facie case for causation, and the Respondent's obligation to submit evidence of alternative causation would only have triggered at that point. *Id.* However, the Respondent's expert provided additional context and alternative interpretations to the evidence that Dr. Steinman was relying on to make his points, thus undercutting support for the theory. *See id.* at *33.

### B. Petitioner's Case

We are cautious not to apply a one-size-fits-all approach to every petitioner, because the nuance matters. Cases must be evaluated based on the medical literature and expert opinions presented that is then applied to the specific facts of each petitioner's claim. Indeed, as the Program has evolved, renowned experts have presented theories that have evolved and been accepted or rejected based on the arguments and supporting literature presented to the special masters in that given case. For example, petitioners have been able to prevail in the absence of epidemiological studies or the specific identification of alleged pathogenic homologous epitopes. Alternatively, ideas that were presented as plausible were not sufficiently developed to be reliable. *See D'Angiolini v. Sec'y of Health & Hum. Servs.*, 122 Fed. Cl. 86, 101 (2015) (the Claims Court affirming the special master's rejection of the ASIA theory by "the world's preeminent expert in autoimmunity," holding that the research is "still developing and currently incomplete"); *see also Cerrone*, 146 F.4th at 1121. There are also Table cases where the science is not proven, and yet we do not require specific causation evidence. The alleged vaccine-cause injury here is not a Table claim, but Petitioner draws many parallels between the Table flu/GBS injury and his off-Table claim to establish many of the parameters foundational to his asserted causation theory. And so, a case-by-case analysis is needed. In such off-Table cases, Petitioner's theory "must be supported by a sound and reliable medical or scientific explanation." *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378 (Fed. Cir. 2009); *Knudsen*, 35 F.3d at 548.

#### 1. Epidemiological Studies

Within the medical community, epidemiological studies are considered among the best types of evidence. In the Program, they have been used as a basis for Table claims, which when specific criteria are met, provide a presumption of causation for the petitioner that can then be rebutted by Respondent. Due to the rare occurrence rate of many of the injuries that are examined in the Vaccine Program, it is often difficult, if not impossible, to find relevant, large-scale studies that prove or disprove vaccine causation. Consequently, "petitioners are not required to support their claims with epidemiology." *Romine*, 2026 WL 937898, at *35 (citing *Althen*, 418 F.3d at 1279–81). However, to the extent that studies do exist, they can be used to support or rebut a theory that a petitioner presents. *Lampe*, 219 F.3d at 1365; *McCollum v. Sec'y of Health & Hum. Servs.*, 760 Fed App'x 1003, 1008 (Fed. Cir. 2019). In *Romine,* the special master noted that this is one of those rare instances wherein there are multiple large-scale studies and suggested "if a pneumococcal vaccine were increasing the incidence of GBS, one of these studies would have detected an uptick." *Romine*, 2026 WL 937898, at *35. In the majority of cases, the lack of epidemiological studies supporting Petitioner's theory is a point that Respondent will mention, even as he acknowledges that such studies are not required. This fact is rarely probative. Dr. Steinman argued that while GBS is a common neuropathy, it is a rare illness, particularly following any vaccination. As a result, it is unlikely that a causal relationship would be statistically detectable in an epidemiological study. Dr. Steinman also argued the relevant studies that have been done have been unable to definitively rule out a causal relationship between PCV-13 and GBS.

#### 2. Petitioner's Diagnosis

All the medical professionals in this case, including Petitioner's treaters and the experts retained by Petitioner and Respondent, agree that the relevant condition is GBS. Furthermore, Respondent does not dispute Petitioner's characterization of the underlying facts regarding the timing, onset, and nature of Petitioner's symptoms. Indeed, the determinative issue in this case is

20

whether there is preponderant evidence of a causal mechanism for GBS following PCV-13 vaccination.

### 3. General Causation

Under *Althen* prong one, Petitioner must set forth a medical theory explaining how the received vaccine could have caused or sustained injury. *Andreu*, 569 F.3d at 1375; *Pafford*, 451 F.3d at 1355–56. Petitioner's theory of causation need not be medically or scientifically certain, but it must be informed by a "sound and reliable" medical or scientific explanation. *Boatmon*, 941 F.3d at 1359; *see also Knudsen*, 35 F.3c at 548; *Veryzer v. Sec'y of Health & Hum. Servs.*, 98 Fed. Cl. 214, 223 (2011) (noting that special masters are bound by both § 13(b)(1) and Vaccine Rule 8(b)(1) to consider only evidence that is both "relevant" and "reliable"), *aff'd* 475 F. App'x 765 (Fed. Cir. 2012). If Petitioner relies upon a medical opinion to support her theory, the basis for the opinion and the reliability of that basis must be considered in the determination of how much weight to afford the offered opinion. *See Broekelschen*, 618 F.3d at1347 ("The special master's decision oftentimes is based on the credibility of the experts and the relative persuasiveness of their competing theories"); *Perriera v. Sec'y of Health & Hum. Servs.*, 33 F.3d 1375, 1377 n.6 (Fed. Cir. 1994) (stating that an "expert opinion is no better than the soundness of the reasons supporting it" (citing *Fehrs v. United States*, 620 F.2d 255 (Ct. Cl. 1980))). Importantly, as the Federal Circuit has made clear, "simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof." *LaLonde*, 746 F.3d at 1339. Instead, Petitioner must show it was more likely than not that the vaccine caused the condition alleged. *Id.*

Dr. Steinman's molecular mimicry theory was summarized in Petitioner's motion for a ruling on the record as "molecular mimicry showing that the components of [PCV-]13 contain phosphoglycerol structures and peptide sequences aligning with paranodal proteins that can trigger GBS." Pet'r's Mot. at 16. Specifically, he identified "homology between the phosphoglycerol present in serotypes 18C and 23F in the [PCV-]13 vaccine and phospholipids in the human myelin sheath." *Id.* at 17. A second molecular mimic pathway "involves the homology between the protein component of [PCV-]13, known as CRM197, and a protein found in the human body, contactin-1, that is targeted in some cases of GBS." *Id.* Dr. Steinman acknowledged that his research on immunogenic homologs was done in the context of MS but argued that the diseases are sufficiently similar to apply his findings to GBS patients. He further asserted that studies on GBS patients have revealed the presence of these antibodies, thereby establishing a causal relationship with the disease.

According to Dr. Steinman, the antibody binds to the phosphoglycerol component of the sugar as well as the sugars in the 23F and 18C components of PCV-13. Neither Drs. Jameison nor Hedrick rebut or directly dispute the mechanics of Dr. Steinman's theory. His assertions are explained with supporting literature and given credence by his learned background and expertise. There is no counterpoint to identify any potential weaknesses in Petitioner's causation theory. Instead, there is an overreliance on epidemiological studies to track the acknowledged rare vaccine injury. Dr. Hedrick summed up the rebuttal to Petitioner's case by stating, "cases of vaccine-caused autoimmunity, regardless of mechanism, do not escape the extant mechanism of surveillance." Resp't's Ex. C at 5. However, it is well established that epidemiological evidence is not required to prove Petitioner's causation theories. There is preponderant evidence supporting Dr. Steinman's explanation of how cross-reactivity could occur between the phosphoglycerol and the myelin sheath.

21

Dr. Steinman emphasized that PCV-13 sugars are combined with CRM197, that has one amino acid different than diphtheria toxin, and the sugars and the CRM197 are adjuvanted to boost the immune response. He argued that this increases the risk of cross-reactivity. While Respondent's experts emphasized that homology does not necessarily mean pathogenic cross-reactivity, their discussion of the homologs presented in this case are too general to be persuasive.

BLAST search-based cross-reactivity has been asserted in the Program by Dr. Steinman over the years with varying degrees of success. While homology can be evidence of cross-reactivity, even with short peptide chains, there must be some evidence that said cross-reactivity was harmful to the host in order to establish vaccine-caused disease via molecular mimicry. Using a Pubmed BLAST search algorithm, Dr. Steinman BLASTED contactin-1 versus CRM197 and discovered an epitope that he asserted might be capable of inducing a neuroinflammatory disease. Dr. Steinman asserted that his BLAST search plus process not only identifies relevant homologous epitopes but also provides evidence of immunogenicity necessary for pathogenesis. In order to establish that homologous parts of the mimics he found in CRM197 and contactin-1 were relevant immunogenic epitopes, Dr. Steinman filtered his results through online tools and found an epitope in diphtheria toxin, which has only one amino acid difference from CRM197. Dr. Steinman again acknowledged the limitations on the available evidence but used the literature he filed to develop a medical theory of causation. In his response, Dr. Hedricks allowed for the possibility of Dr. Steinman's theory.

> Dr. Steinman has described in impressive detail the possibly that similar structures found in [PCV-]13 and the human nervous system might exist, and might be the targets for cross-reactions that could explain either antibody or T cell-mediated pathogenic immunity; however, the realm of the possible is not nearly sufficient to establish likely causality.

Resp't's Ex. C at 6. However, he asserted that "[t]he major conclusion from studies on the safety of pneumococcal conjugate vaccines" is sufficient evidence that "we do not have to guess" if this mechanism is viable. *Id.* Dr. Hedricks concluded that the epidemiology studies are definitive, and conjugated pneumococcal vaccines, in any iteration, do not cause GBS.

The research that Dr. Steinman and others have done on MS has been nothing short of groundbreaking. In comparing decisions that accept and reject Dr. Steinman's theory, a critical factor that emerges is to what degree Respondent's experts directly and painstakingly responded to each step of Dr. Steinman's theory. *See Fee*, 2026 WL 700326, at *13 (accepting Petitioner's theory and noting that Respondent's expert provided only generic objections to Petitioner's theory of causation); *but see Hunt*, 2026 WL 1601989, at *33 (rejecting Petitioner's theory after a deep analysis of specific arguments addressing Dr. Steinman's theory). While not conceding that Dr. Steinman's MS research supports molecular mimicry as a pathogenic mechanism in humans, Dr. Hedrick acknowledged the evidence developed and submitted by Dr. Steinman of molecular mimicry, but he characterized it as pathogenic direct immunization in most instances, and not an example of true molecular mimicry. In the one instance that was, in Dr. Hedrick's opinion, accurately presented as molecular mimicry, the cross-reactivity between C. jejuni gangliosides and mammalian neuronal membrane gangliosides was substantively different than the reaction that Dr. Steinman proposed in this case. In short, Respondent's experts discounted Dr. Steinman's theory wholesale based on large scale studies and nomenclature without persuasively explaining why it could or did not work in this specific case.

22

Respondent relies entirely on epidemiological studies to explain the inability to detect what both Drs. Steinman and Hedrick would describe as a rare occurrence. Because of the low incidence of serious vaccine-caused injury, we do not require epidemiological studies to meet the preponderant evidence standard. Indeed, the Vaccine Act only "require[s] a chain of reliable propositions supporting [a] petitioner's theory[]"). *D'Tiole v. Sec'y of Health & Hum. Servs.*, No. 15-085V, 2016 WL 7664475, at *24 (Fed. Cl. Spec. Mstr. Nov. 28, 2016). Here, Dr. Steinman has provided such evidence that was not persuasively rebutted by Dr. Hedrick; therefore, Petitioner has offered a scientific or medical theory that answers in the affirmative the question: can the vaccine at issue cause the type of injury alleged, and met her burden pursuant to *Althen* prong one.

## C. Specific Causation

Under *Althen* prong two, Petitioner must prove by a preponderance of the evidence that there is a "logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Capizzano*, 440 F.3d at 1324 (quoting *Althen*, 418 F.3d at 1278). "Petitioner must show that the vaccine was the 'but for' cause of the harm . . . or in other words, that the vaccine was the 'reason for the injury.'" *Pafford*, 451 F.3d at 1356 (internal citations omitted). This includes instances where an action is "a substantial factor in bringing about the harm, and that the harm would not have occurred but for that action." *Shyface*, 165 F.3d at 1365 (internal citations omitted). The Federal Circuit has explained that in such cases, "while the vaccination must be a substantial factor in the [injury], it need not be the sole factor or even the predominate factor." *Pafford*, 451 F.3d at 1357.

In evaluating whether this prong is satisfied, the opinions and views of the vaccinee's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("[M]edical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause-and-effect show[s] that the vaccination was the reason for the injury.'" (quoting *Althen*, 418 F.3d at 1280)). Medical records are generally viewed as trustworthy evidence, since they are created contemporaneously with the treatment of the vaccinee. *Curcuras*, 993 F.2d at 1528. Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." *Capizzano*, 400 F.3d at 1325. Instead, Petitioner may satisfy her burden by presenting circumstantial evidence and reliable medical opinions. *Id.* at 1325–26.

One medical record from Petitioner's hospitalization included a treater's opinion that Petitioner "ha[d] [GBS] from the pneumococcal vaccine [three] weeks ago." Pet'r's Ex. 10 at 14. Respondent acknowledged this statement but argued that the treater is a hospitalist and not a neurologist; therefore, his opinion should not be given substantial weight. Petitioner's treating neurologist, Dr. Tanase also noted that Petitioner developed GBS "within two weeks of a [PCV-13] vaccine." Pet'r's Ex. 6 at 16. Respondent's criticism of this record is less resounding and merely notes that observation of a temporal relationship is not evidence of causation. Respondent concedes that if "a petitioner proffers a reliable medical theory of causation and establishes an appropriate temporal association between vaccination and her alleged injury, then the opinions of treating physicians could be probative with respect to causation." Resp't's Response at 19 (citing *Capizzano*, 440 F.3d at 1326). Indeed it is not sufficient evidence alone, to establish a logical sequence of cause and effect; however, the fact that her medical provider who specializes in GBS

23

considered and recorded the type of vaccine and timing is certainly evidence to be considered as probative.

Respondent argued that "Petitioner has presented no evidence that the manifestation of [P]etitioner's GBS was somehow aberrant from a typical manifestation of GBS absent vaccination." Resp't's Response at 19. However, as has been noted in previous cases, "[o]rdinary medical care offers little beyond clinical history that would confirm the cause of GBS." *Davison*, 2025 WL 2692664, at *7 (citing *Datte v. Sec'y of Health & Hum. Servs.*, No. 18-2V, 2025 WL 1565894, at *21 (Fed. Cl. Spec. Mstr. May 9, 2025) (alteration in original) (quoting *Bartoszek v. Sec'y of Health & Hum. Servs.*, No. 17-1254V, 2024 WL 4263604, at *23 (Fed. Cl. Spec. Mstr. Aug. 27, 2024)). Furthermore, Petitioner's theory of specific causation does not suggest an aberrant manifestation of GBS. Respondent did not assert that a distinct manifestation should be expected, and even in Table flu/GBS claims, the Qualifications and Aids to Interpretation are consistent with non-vaccine specific diagnostic standards for GBS. 42 C.F.R. § 100.3(c)(15).

Lastly, "a petitioner is certainly permitted to use evidence eliminating other potential causes to help carry the burden on causation and may find it necessary to do so when the other evidence on causation is insufficient to make out a prima facie case." *Walther v. Sec'y of Health & Human Servs.*, 485 F.3d 1146, 1151 (Fed. Cir. 2007). Petitioner has submitted preponderant evidence that her GBS was caused-in-fact by her January 15, 2019 PCV-13 vaccine, and met her burden pursuant to *Althen* prong two.

### D. Temporality

*Althen* prong three requires Petitioner to establish a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. Petitioner must offer "preponderant proof that the onset of symptoms occurred within a tie frame for which, given the medical understanding of the disorder's etiology, is medically acceptable to infer causation-in-fact." *de Bazan*, 539 F.3d at 1352. The explanation for what is a medically acceptable time frame must also coincide with the theory of how the relevant vaccine can cause the injury alleged (under *Althen* prong one). *Id.*; *Koehn v. Sec'y of Health & Hum. Servs.*, 773 F.3d at 1239, 1243 (Fed. Cir. 2014); *Shapiro*, 101 Fed. Cl. at 542; *see Pafford*, 451 F.3d at 1358. A temporal relationship between a vaccine and an injury, standing alone, does not constitute preponderant evidence of vaccine causation. *See, e.g., Veryzer*, 100 Fed. Cl. at 356 (explaining that "a temporal relationship alone will not demonstrate the requisite causal link and that [P]etitioner must posit a medical theory causally connecting the vaccine and injury").

Petitioner received the PCV-13 vaccine on January 15, 2019, and sought medical treatment 13 days later with complaints of bilateral leg pain for the preceding five days. *See* Pet'r's Ex. 5 at 17. Petitioner returned to the hospital on February 6, 2019, unable to ambulate and was admitted to the hospital. *Id.* at 16. The treating neurologist identified her symptoms as possible GBS and noted the temporal relationship between her PCV-13 vaccine and her symptom onset. This is circumstantial evidence that the time between Petitioner's vaccination and GBS symptoms could be relevant if a relationship between the two is suspected. Temporal relationships alone cannot establish causality; however, a symptom onset time that is consistent with Petitioner's asserted biological mechanism is persuasive in the context of a well-reasoned theory.

Dr. Steinman identified Petitioner's onset of symptoms as appropriate and relied on the timeline from epidemiologic data supporting a causal connection between the 1976 swine flu

24

vaccine and GBS when onset occurred two to 34 days post inoculation. This extrapolation is consistent with Dr. Steinman's reliance on other more established principles of vaccine injury causation to assert his causation theory with respect to GBS following PCV-13 vaccination, including molecular mimicry generally and specific cross-reactivity targets in peripheral neuropathy. Dr. Jamieson argued that it is not enough that Dr. Steinman "makes a leap from pandemic [flu] vaccination in 1976–1977 to current bacterial vaccination." Resp't's Ex. A at 12. She characterized his statement that "this study on the swine flu vaccine and GBS . . . is analogous to what we would expect to see . . . for the [PCV-]13 vaccine and GBS," as not reflective of current data. *Id.* Dr. Jamieson, however, did not expand on this description of Dr. Steinman's opinion, nor did she offer more contemporary data to rebut his assertions. Dr. Jamieson opined that there was no evidence submitted that defined an appropriate causal timeframe. *Id.* at 12. Dr. Steinman responded to Dr. Jamieson's criticism by citing examples of GBS cases that were studied in part because of their temporal relationship to PCV-13 vaccination. He noted that median time from vaccination to symptom onset in the studies was nine days.

I have previously found that the time frame identified for a Table flu/GBS case can be applicable to molecular mimicry theories generally. I have also stated in prior decisions, that in order to fairly consider the merits of each case, particularly when the presented evidence is similar, it is imperative to analyze the evidence and arguments submitted within that specific record. In *Fee*, for example, Respondent's expert did "not contest whether Petitioner's eight-day onset is appropriate, and Respondent pose[d] no objection to the proposed timing of Petitioner's theory." *Fee*, 2026 WL 700326, at 27. There, based on the unrebutted evidence, I found that Petitioner had presented preponderant evidence of appropriate timing. In *Hunt,* based in part on the rebuttal evidence presented by Respondent's expert, I found that Petitioner did not provide preponderant evidence of appropriate timing. *See generally Hunt*, 2025 WL 1555004. In *Davison,* a case decided by a different special master, Dr. Steinman also relied on the swine flu study to provide an appropriate temporal relationship. The special master noted that in that case, Respondent's expert did not articulate why the differences between the vaccines "are meaningful distinctions vis-à-vis the expected timing of onset." *Davison*, 2025 WL 2692664, at *15. Presently, the temporal relationship of eight days from vaccination to leg pain is consistent with the timing required in successful Table flu/GBS claims, consistent with the case studies and causation theory asserted by Dr. Steinman, and supported by physician notes in the medical record that contemplate the significance of the timing. Petitioner has presented preponderant evidence that onset of her GBS occurred within a medically acceptable timeframe from which vaccine causation can be inferred.

### E.  Alternative Causation

Once Petitioner has satisfied her own burden of proof, the burden shifts to Respondent to demonstrate by a preponderance of the evidence that the injury was caused by factors unrelated to vaccination. § 300aa-13(a)(1)(B); *Deribeaux v. Sec'y of Health & Human Servs.*, 717 F.3d 1363, 1367-69 (Fed. Cir. 2013). Respondent has not presented any factor unrelated to vaccination as a potential cause of Petitioner's GBS.

## VII.    Conclusion

The biological mechanism that Dr. Steinman has presented is his signature theory, supported by many co-authored articles, and it has helped shape our understanding of molecular mimicry and the pathology of neurology in the medical community and this Program. Respondent has failed to persuasively rebut Dr. Steinman's assertions regarding homology and pathogenesis,

relying heavily on the lack of epidemiologic evidence. However, such evidence is not required for a claim to be successful. Furthermore, there is no asserted alternative cause presented to counter Petitioner's prima facie case.

After a careful review of the record, and for the reasons discussed above, I find that Petitioner has established by preponderant evidence that her PCV-13 vaccine administered on January 15, 2019, caused her to develop GBS. Therefore, Petitioner is entitled to compensation. A separate damages order will issue.

**IT IS SO ORDERED.**

s/Herbrina D.S. Young
Herbrina D.S. Young
Special Master

26